# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                            CR No. 14-2209 JCH

BERLAND THOMAS,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress and Request for Evidentiary Hearing (ECF No. 20).  The Court held a hearing on the motion on December 9, 2014.  The Court, having considered the motion, briefs, evidence, argument, and otherwise being fully advised, concludes that the motion to suppress should be granted in part and denied in part.  The Court concludes that the officers violated Defendant's Fourth Amendment rights in entering the home without a warrant or consent and in arresting him, and will exclude evidence that is the fruit of the Fourth Amendment violation – the blood swabs from Defendant's hand, his clothing, and his June 6, 2014 statements to law enforcement.  The Court will reserve ruling, following additional briefing, on whether the Fourth Amendment violation requires suppression of the fact that he was located within the home, his physical appearance, and his June 8, 2014 confession.  The Court will not suppress the evidence discovered outside the home, on the threshold, or inside the home based on the independent source and inevitable discovery doctrines.  The Court also rejects Defendant's arguments that the Government violated

his rights under the Fifth Amendment and Federal Rule of Criminal Procedure 5(a).

## I.    FACTUAL FINDINGS

On June 6, 2014, at around 11:00 a.m., Navajo Nation Tribal Police Officer Rory Knight learned from dispatch that a male individual was bleeding and lying on the side of the road. Hr'g Tr. 9, 11-12, Dec. 9, 2014 (hereinafter "Hr'g Tr."). The dispatch did not reference an exact location or a particular residence. *See id.* at 38. When he was approaching a house in Mexican Springs, New Mexico, he saw an ambulance already at the house and medical personnel were putting a male in the back of the ambulance. *See id.* at 12, 16, 40, 69. Without getting out of his police unit, he followed the ambulance to the junction of the Indian housing in Mexican Springs where he parked his unit to block traffic while the ambulance waited for a helicopter. *See id.* at 12, 40-41. While waiting, Officer Knight approached the victim and observed his bloodied face. *See id.* at 13-14, 16. The helicopter arrived after approximately 15 minutes. *See id.* at 41. The victim was transported by helicopter to a hospital in Gallup, New Mexico. *See* Gov. Ex. 30.

At approximately 12:09 p.m., Officer Knight left the ambulance, returned to the house, got out of his vehicle, and walked counterclockwise around the house. Hr'g Tr. 17, 45. He saw three vehicles parked outside the house. *See id.* at 20, 24-25; Gov. Ex. 14. As he approached the north door, he yelled out, identifying himself as a police officer, but nobody answered. *See* Hr'g Tr. 17, 20-21. He noticed red bloodstains on the cement patio, on some buckets, and on the walls. *See id.* at 25, 46. He also observed bloodstained footprints, including a bloody footprint on the threshold of the door into the home. *Id.* at 27-28, Gov. Ex. 23-25. The screen door was closed, but the interior door was open. Hr'g Tr. 48. He knocked on the north side door to the home. *See id.* at 20-21. There was no answer, and he did not hear any noise coming from inside the house. *See id.* at 29-30, 46.

2

Officer Knight was concerned about the safety of another person who might be injured in the home, but because of concern for his own safety, he decided to wait for back up. *See id.* at 29-30. Officer Knight sat in his vehicle while he waited and observed the house. *See id.* at 47. At 12:51 p.m., he received a dispatch that the patient was severely beaten. *See id.* at 70-71, 125-26; Gov. Ex. 30. At 1:22 p.m., Officer Fredrick Bitsoi arrived. *See* Hr'g Tr. 30, 47.

Officer Knight and Officer Bitsoi knocked and announced their presence, but no one responded. *Id.* at 31. They entered the home with weapons drawn to search for an injured person. *See id.* at 31-32, 49. Upon entering, they saw bloodstains on the floor, including a bloody footprint. *Id.* at 31-32. They found a man, later identified as Defendant Berland Thomas, sleeping on a bed in the west bedroom. *Id.* at 32. They shook him and announced their presence to awaken him. *Id.* When he woke up, they noticed that he smelled of alcohol; had red, watery eyes; and had bloodstains on his right hand, shirt, pants, and shoes. *See id.* at 32-35.

Officer Knight walked him outside. *See id.* at 34, 54-55. Officer Knight asked Defendant what happened to his hand, but he did not say anything. *Id.* at 34. Officer Bitsoi asked again what happened. *Id.* at 62. Defendant allegedly responded, "Mark, my brother Mark, Derrick and Charles were fighting, I went inside the house and went to sleep, came back out and went back inside." Def.'s Ex. C, ECF No. 27-1 at 2 of 3. Neither officer had given Defendant any *Miranda* warnings. *See* Hr'g Tr. at 62-63.

Officer Knight told Defendant he was under arrest for public intoxication. *Id.* at 35. Officer Knight then handcuffed him and placed him in the back of his police unit. *See id.* at 34, 55. Officer Knight believed that it is illegal to be intoxicated on the Navajo Reservation inside or outside the home, so he arrested him under the public intoxication statute, Section 488 of Title 17 of the Navajo Nation Code. *See id.* at 34, 55-56. The officers kept Defendant in the back of

the police unit until agents from the Federal Bureau of Investigation ("FBI") arrived.  *See id.* at 35-36.

FBI Special Agent Jacob R. Guffey arrived on scene at around 3:00 p.m.  *Id.* at 64, 77-79. Officer Knight briefed him on what had taken place.  *Id.* at 64.  Agent Guffey also spoke with the other criminal investigators that were there, and he introduced himself to the family members that were gathering at the end of the drive.  *Id.* at 79-80.

After conferring with the other officers, Agent Guffey interviewed Defendant while he was handcuffed in a tribal police unit.  *Id.* at 80.  Officer Knight was present during the interview.  *Id.* at 64.  Agent Guffey recorded the interview.  *Id.* at 81.

At the beginning of his interview, Agent Guffey told Defendant that he would advise him of his rights and asked if he had ever heard of that before.  Interview Tr. 2, June 6, 2014, ECF No. 37-1.  Defendant responded, "Yeah.  Miranda Rights?"  *Id.*  Agent Guffey confirmed they were *Miranda* rights and then he advised him of the *Miranda* warnings.  *Id.* at 2-3.  Defendant was coherent, his words were not slurred, and he appeared to understand his rights, saying he wanted to talk because he had nothing to hide.  *Id.* at 3; Gov.'s Ex. 5 (CD of Recorded Interviews).  The tone of the interview was casual and friendly, and Defendant's tone of voice was relaxed and he was lucid.  Gov.'s Ex. 5.

Agent Guffey told him that before he signed the FBI consent-to-interview form, he did not want him touching the pen because his hand was a little bloody and he wanted to get some swabs from his hand.  *See* Interview Tr. 3, June 6, 2014, ECF No. 37-1.  Agent Guffey then asked him what he had to drink that day.  *Id.*  Defendant said he, his brother Mark Tsosie, and his nephew Derrick Smith finished a liter of vodka.  *Id.* at 3-6.  Agent Guffey asked him how much of that liter he drank, and Defendant replied, "Probably about half of it."  *Id.* at 7.

Agent Guffey continued questioning Defendant.  Defendant stated that "they" started arguing about his sister.  *Id.* at 7-8.  He reported that he went inside, heard noises of a fight, and came outside.  *See id.* at 8.  Defendant said he told Derrick to get out of here, to cut it out because their mom would be back and see them, but that they started fighting with their fists again.  *See id.* at 8-9.  Defendant reported that he went back inside for a while, but ran back outside when he heard more fighting, saw Mark lying on the ground, and he again told Derrick to get out of here.  *See id.* at 9.  Defendant said that Derrick started fighting him, and he again told him to get out of here.  *Id.*  Defendant reported that he tried to help Mark up, but Mark said to leave him alone, so Defendant went back inside, laid down, and the next thing he knew, the police had handcuffed him.  *Id.*

Later in the interview, Agent Guffey told Defendant that his brother was dead, and Defendant began sobbing and was very distraught.  *Id.* at 15; Gov. Ex. 5.  Agent Guffey explained that his brother's death was the reason the FBI was involved, and asked if he understood why this was serious and why he was asking him these questions.  *See* Interview Tr. 15-16, June 6, 2014, ECF No. 37-1.  Defendant said he understood.  *Id.* at 16.  Agent Guffey asked him what Derrick hit Mark with, and Defendant replied he did not know, that they were fighting in the back when he came out, and he only heard rumbling.  *Id.* at 16-17.

Agent Guffey told him that his mom would get there in a minute, and "We're gonna take a look around the house, all right?  Inside and out, trying to figure out what happened.  Okay?" *Id.* at 17.  Defendant did not respond to Agent Guffey's question; instead, he continued sobbing and talking about losing his brother.  *See id.*  Agent Guffey asked him how he got blood on his hands.  *Id.* at 18.  Defendant replied, "I was helping him.  I was trying to help him out.  Mark." *Id.*  Agent Guffey then said, "I need you to give me consent to . . . swab your hands.  *Id.*

Defendant replied, "This is his, I know it's his blood.  Yeah."  *Id.*  Agent Guffey responded, "[W]e have to do it on our end.  We're just gonna take some samples of it, okay?  For a little bit of comparison.  Make sure there's, make sure it didn't come from somebody else.  Okay?  Do you understand?"  *Id.*  Defendant replied, "Yes."  *Id.*  Agent Guffey acknowledged that he was distraught and Defendant talked about how he would not have slept in the room if he had known something bad had happened to his brother.  *Id.* at 18-19.  Agent Guffey then started to read a document to him about permission to search for swabs and his clothing, explaining that he wanted to swab the inside of his cheek and his hands where there was blood.  *Id.* at 19. Defendant said, "Yeah."  *Id.*

Agent Guffey informed him that they were going to have to take him to jail because he had been drinking, and that they were going to take his clothing and shoes.  *Id.*  Defendant responded, "Why do I have to go to jail?  I didn't do nothing.  I was just sleeping."  *Id.*  Agent Guffey continued to read the rest of the advice of rights form, explaining that he could refuse consent, but that they would hold him "until we get a, a judge to give us an order."  *Id.* at 20. The following exchange then occurred:

> Witness:  You can do whatever you want.
>
> Interviewer:  Do you understand?  "I give this permission voluntarily." It means no one's beating you up or anything like that . . .
>
> Witness:  Yeah, I understand, but. . .
>
> Interviewer:  And then, "I authorize these agents to take any items which they determine may be related to investigation."  Do you understand?
>
> Witness:  Yeah.

*Id.*

Defendant signed the Consent to Search form to permit a search of his clothing and to

take swabs from his person.  *See* Gov. Ex. 7; Hr'g Tr. 86-87.  Agent Guffey finished the interview at 3:50 p.m.  Interview Tr. 22, June 6, 2014, ECF No. 37-1.

Agent Guffey then met with the family again and explained that he was going to search the house and area.  Hr'g Tr. 87.  Agent Guffey identified the owner of the home, Margaret Thomas, and received verbal consent to search the home.  *See id.* at 88, 90-91.  Agent Guffey returned to the house where he observed pools of blood on the patio.  *See id.* at 88.  Agent Guffey and Investigator Robert James processed the outside of the house first.  *See id.* at 88-89.  Agent Guffey and Evidence Technician Donovan Vicente then entered the main entryway of the home to begin processing the inside of the house.  *See id.* at 88-90.  Donovan Vicente asked Agent Guffey if he had received written consent.  *Id.* at 90.  Agent Guffey decided that he should get written consent as well, so he and Robert James went to talk to Ms. Thomas.  *See id.* at 90-91.  After the agents explained the Consent to Search form, with Investigator James translating the form into Navajo, Ms. Thomas signed the form, authorizing the agents to search her home.  *See id.*; Gov. Ex. 8.

After receiving written consent, Agent Guffey and Donovan Vicente processed the home and collected evidence.  *See* Hr'g Tr. 93.  They took photographs of blood droplets and took DNA swabs.  *Id.*

Agent Guffey then spoke to the family again, informing them that Defendant and his brother Charles Smith would be released the next day from the public intoxication charges by the Navajo Police Department.  *See id.* at 94.  Officer Bitsoi transported Defendant and Charles Smith to the Crownpoint Detention Center and booked them for public intoxication.  *See id.* at 60, 94; Def.'s Ex. A, ECF No. 27-1 at 2 of 3.  Later that evening, charges were added against Defendant for aggravated battery against a family member.  Hr'g Tr. 75-76; ECF No. 36 at 3-4

of 4 (Navajo Nation Detention Center Record; Navajo Nation Criminal Code Excerpts).

Agent Guffey then left to interview Derrick Smith.  Hr'g Tr. 94.  Mr. Smith denied any involvement and said he was with family all that day.  *Id.*  Other family members confirmed Mr. Smith's alibi.  *See id.* at 94-95.  The agents then decided to talk to the 911 caller who reported the crime, Daryll Atkins, to get more information to determine who was lying to them.  *Id.* at 95.

Later that evening, Agent Guffey, Officer Knight, and Officer Bitsoi interviewed Daryll Atkins.  *See* Hr'g Tr. 65, 95.  Mr. Atkins reported that he had gone to Defendant's home to see him, and, as he pulled up to the house, Defendant came out and said, paraphrasing, "Bro, I think I just killed my bro."  *Id.* at 95.  Mr. Atkins informed the officers that Defendant had blood on him and was carrying a bottle of vodka with blood on it.  *Id.*

On June 8, 2014, at 9:37 a.m., Agent Guffey, with Investigator James present, interviewed Defendant at the Navajo Detention Center, which they recorded.  *See* Interview Tr. 2, June 8, 2014, ECF No. 37-2.  During the interview, Agent Guffey was calm and friendly.  *See* Gov. Ex. 5.  Agent Guffey brought an Advice of Rights form, and read the form aloud to Defendant.  Interview Tr. 2-3, June 8, 2014, ECF No. 37-2.  Defendant agreed to waive those rights and talk to them.  *See id.* at 3.  Defendant signed the Advice of Rights form.  Gov. Ex. 4.

Agent Guffey informed Defendant that he had waited to question him again so that Defendant had "time to, to sober up and, and have time to clear your head and think about things . . . ."  Interview Tr. 4, June 8, 2014, ECF No. 37-2.  After getting biographical information from Defendant, Agent Guffey said that, when they talked previously, Defendant had seemed "shaken up," "nervous about stuff," and he "didn't feel quite right."  *Id.* at 5.  Agent Guffey explained that he had talked to the other individual who he had said had been involved, and his family, and they all said he had been with them all day.  *Id.*  He also informed Defendant that they spoke to

8

the fellow who called 911 who had showed up at Defendant's house.  *See id.*  Agent Guffey asked Defendant additional questions, urging him to be honest and to tell his family the truth.  *Id.* at 6.

They then began discussing the events of the morning of the incident.  *See id.* at 6-9. Agent Guffey used open-ended and leading questions, and Defendant explained what happened that morning.  *See id.* at 6-17.  Defendant said that his brother Mark went with him to sell burritos that morning, but Mark wanted to get alcohol, so they bought alcohol and began drinking.  *See id.* at 9-10.  He said Charles Smith came in and Mark yelled at Charles because his dogs barked at night.  *See id.* at 10.  Defendant explained that he and Charles Smith started walking out of the house, but as they did so, Mark struck Defendant on the shoulder, Defendant then lunged at Mark, and they started fighting.  *See id.* at 10-12.  Defendant said Charles left when the fight started.  *See id.* at 11.  Defendant admitted that he and Mark wrestled to the ground, and that he punched Mark about 8-9 times before stopping when Mark pushed him away.  *See id.* at 11-14.  Defendant admitted that Mark's nose and mouth were bleeding after he punched him.  *See id.* at 14.

Defendant said afterwards he blacked out and had trouble remembering what happened. *See id.* at 18.  He said he went to the shed with his brother Charles and drank more, Charles then walked down the hill to continue drinking, and Defendant went back to the house where he tried to get Mark up, but Mark told him to leave him alone.  *See id.* at 18-20.  Defendant explained that he went inside to sleep and the next thing he remembered was being arrested by police.  *Id.* at 20-21.  Defendant said that he did not remember talking to Darryl Atkins and thought he was talking to someone else.  *See id.* at 21-23.

Later, Agent Guffey told Defendant that he wanted to give him an opportunity to write

his mother a letter of apology, so that his mother did not think she has "a monster of a son," and to show her that he was taking responsibility.  *See id.* at 23-24.  Agent Guffey gave him a minute to write something.  *See* Gov. Ex. 5.  Defendant sat silently for a couple minutes, and then said, "I don't even know what to say."  *Id.*; Interview Tr. 24, June 8, 2014, ECF No. 37-2.   Agent Guffey read what Defendant had written, saying aloud:

| | |
|---|---|
| Interviewer: | Well, let's see what you got.  I'll help you along.  "Mom, I'm sorry for what happened.  I hope you can forgive me for the hurt I put on you.  I shouldn't have never started drinking again.  I didn't mean for any of this to happen." Well, let's, I'll tell you what will be, as a, as a, as a parent, you have kids? |
| Witness: | I have daughters. |
| Interviewer: | Okay. . . .  If somebody was writing a letter to you about your daughter being, being killed, what would you want to hear?  Would you want to hear, would you want them to say, "I'm responsible for his death?" |
| Witness: | Yeah.  I'm just trying to figure out how I can put it in here. |
| Interviewer: | Well, you can write, "I'm responsible for his death.  I'm taking responsibility." |
| Witness: | Okay. |

Interview Tr. 24-25, June 8, 2014, ECF No. 37-2.  There was silence for a few seconds before Agent Guffey told Defendant, "Write, 'I hit him when I shouldn't have hit him.'"  *Id.* at 25; Gov. Ex. 5.  Defendant then wrote in silence for a minute or so, before Agent Guffey began reading aloud from the letter Defendant wrote:

| | |
|---|---|
| Interviewer: | "I, I take my responsibility for my brother's death.  I hit him when I shouldn't have.  I don't know what's going to happen to me but I have to go on living with . . .," is that. . . |
| Witness: | When. |
| Interviewer. | ". . . when my brother can't.  I should have listened to you, |

but please forgive me, mom.  What I did, I can't take
back."  That's pretty good.  Go ahead and just sign it that it,
you know, so she knows it comes from you. . . .

Interview Tr. 25, June 8, 2014, ECF No. 37-2.

Agent Guffey later asked Defendant, "And my question to you, I know, I know what the
answer is, but my question to you is do you think if you hadn't hit him, that he'd still be with us
today?"  *Id.* at 27.  Defendant responded, "Yes."  *Id.*  Agent Guffey and Investigator James asked
a few more questions and ended the interview at 10:14 a.m.  *See id.* at 27-29.

On June 9, 2014, Agent Guffey sought and obtained a Criminal Complaint against
Defendant for Murder in Indian Country in violation of 18 U.S.C. §§ 1153, 1111, for unlawfully
and with malice aforethought killing Mark Tsosie by repeatedly beating him with his fist.
Criminal Compl., ECF No. 1.  That same day, Agent Guffey met with Navajo Nation prosecutor
Bernadine Martin who authorized Agent Guffey to take Defendant into custody.  *See* Def.'s Ex.
C; Hr'g Tr. 103-06.  Agent Guffey then transported Defendant from the Navajo Nation jail and
took him to the McKinley County Detention Center.  *See* Hr'g Tr. 87, 105-06; Def.'s Ex. C.
Agent Guffey collected Defendant's clothing, shoes, and lighter from the jail at the time he
transported him.  Hr'g Tr. 87; Gov. Ex. 10 (Evidence Data-Loading Form).  Defendant made his
initial appearance before a United States Magistrate Judge in Albuquerque on June 10, 2014, at
9:47 a.m.  *See* Clerk's Minutes, ECF No. 3.  A federal grand jury indicted Defendant with second
degree murder on June 24, 2014.  Indictment, ECF No. 11.

On November 5, 2014, Defendant filed a motion to suppress all physical evidence seized
as a result of Defendant's alleged unlawful seizure and arrest on June 6, 2014, and any statement
given by Defendant subsequent to his illegal seizure and arrest.  Defendant argues the officers
went into his home and arrested him without a warrant, probable cause, or an exigency, and all

the evidence the officers seized afterwards, including his statements, were tainted by the illegality. Defendant additionally asserts that he did not voluntarily consent to the officers' search and that his statements were not voluntarily made in violation of the Fifth Amendment. Defendant also argues that his June 8th statement was obtained in violation of his right to prompt presentment before a magistrate judge under Federal Rule of Criminal Procedure 5(a).

The Government argues that the exigent circumstances exception justified the entry by the officers into the home, and that the evidence was later seized pursuant to the homeowner's consent to search. The Government asserts that the statements Defendant made were voluntary.

## II.   ANALYSIS

### A.   Fourth Amendment

#### 1.   Exigency

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const., amend. IV. Physical entry of the home is the chief evil against which the Fourth Amendment is directed. *Wilson v. Layne*, 526 U.S. 603, 610 (1999) (quoting *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972)). Warrantless searches and seizures inside a home are presumptively unreasonable. *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992). Absent exigent circumstances, the threshold of the home may not reasonably be crossed without a warrant. *Payton v. New York*, 445 U.S. 573, 590 (1980). "The government bears the burden of proving the exigency exception to the warrant requirement applies;" a burden that "is especially heavy when the exception must justify the warrantless entry of a home." *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).

12

The Government here relies on the emergency aid exigency that is based on the recognition of critical police duties to prevent violence, restore order, and render first aid to civilians, separate or tangential to a criminal investigation. *See United States v. Porter*, 594 F.3d 1251, 1255-56 (10th Cir. 2010). The test for determining whether the risk of personal danger created exigent circumstances is whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable. *Najar*, 451 F.3d at 718. The exigent circumstances exception to the warrant requirement is narrow and must be jealously and carefully drawn. *Anderson*, 981 F.2d at 1567 (quoting *United States v. Aquino*, 836 F.2d 1268, 1270 (10th Cir. 1988)). The court must examine the circumstances as they would appear to a prudent, cautious, and trained officer. *Najar*, 451 F.3d at 718-19. An officer needs objectively reasonable grounds giving rise to exigent circumstances based on something more than a generalized belief that such circumstances might exist. *See*, *e.g.*, *United States v. Davis*, 290 F.3d 1239, 1243-44 (10th Cir. 2002). "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard." *Porter*, 594 F.3d at 1258 (10th Cir. 2010) (citing *Najar*, 451 F.3d at 718). *See also United States v. Martinez*, 643 F.3d 1292, 1299 (10th Cir. 2011) (confirming that "reasonable belief" standard is lower than probable cause standard).[1]

---

[1] Defendant argues that probable cause is needed for the exigent circumstances exception to apply and that Officer Knight did not have probable cause to believe that anyone was in the home, much less that the person inside had committed a felony offense. *See* Def.'s Reply 2, ECF No. 27. To support his argument that a court does not consider whether there are exigent circumstances unless the police have "clear evidence of probable cause," *id.*, Defendant cites *United States v. Carter*, 360 F.3d 1235, 1241 (10th Cir. 2004). The *Carter* case, however, is distinguishable, as the Tenth Circuit's statement that probable cause is required before a warrantless entry was made in the context of an exigency based on the destruction of evidence. *See id.* In contrast, the exigency here is based on the purported personal danger to someone who

Where there is a need to assist persons who are seriously injured or threatened with such injury, the exigency obviates the need for a warrant. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009). Instead, officers need only an objectively reasonable basis for believing that a person within the house is in need of immediate aid. *Id.* at 47. The first question here is thus whether it was reasonable for the tribal officers to believe their entry was necessary to render immediate aid to a potentially incapacitated occupant in the house. *See Porter*, 594 F.3d at 1257 n.8.

At the time Officer Knight entered the home, he knew from dispatch that someone had reported a male individual bleeding and lying on the side of the road. Officer Knight personally had observed three cars parked at the home, blood on a bucket on the patio and on the wall near the north entrance of the home, a large pool of blood to the left of the door at the north entrance, and a trail of bloody footprints on the patio including a bloody footprint on the threshold of the north screen door. He also knew the interior wooden door at that north entrance was open while the screen door was closed, and no one answered when he knocked and called out. Critically, however, Officer Knight knew that medical personnel had already been to the scene, and transported the victim away by ambulance.

Based on these facts, Officer Knight had reason to believe that a violent crime had occurred on or relatively near the patio. The problem here is that Officer Knight had no evidence of a second victim or that any second victim would be inside the home. The only fact provided by the Government linking the violence on the patio to the inside of the home is the bloody footprint on the threshold. The Government, however, did not offer any evidence linking the

_____

may be unresponsive and hurt inside the home.

footprints to a second victim or perpetrator in need of assistance, rather than to Mr. Tsosie or the medical personnel who had arrived on scene and left.  Given the pool of blood, and the fact that medical personnel were assisting the victim, most reasonably near that pool of blood, the bloody footprints could just have likely been from the medical personnel assisting the victim.  All was quiet inside the home at the time Officer Knight arrived and for over an hour afterwards.  Had Officer Knight heard anything inside the house, had the medical personnel not been on the patio, or had there been any report of a potential second victim, this case might be different.

The Government relies in its brief extensively on the importance of the 911 call to the exigency analysis.  Unlike the cases cited by the Government, here there is no evidence the 911 call originated from someone inside the home or that the 911 caller was reporting a crime occurring inside the home.  Rather, the 911 call came from another location by a concerned citizen, Darryl Atkins.  Significantly, Officer Knight, at the time he entered the house, had no information about the 911 call other than a male victim being reported bloody on the side of the road.  The 911 call thus does not supply a basis for Officer Knight to have reasonably believed that there was a second victim inside the home.  At the time he entered, Officer Knight had no information as to the number of individuals involved in the altercation, other than the victim, who had been removed from the scene, and the perpetrator of the crime.  Even if Officer Knight thought that the perpetrator had left the bloody footprint, rather than the medical personnel, he had no reason to believe that the perpetrator was also injured in need of emergency assistance. There was no evidence presented that violent crimes of this nature usually involve injury to the perpetrator as well.  The evidence here falls within the realm of a "hunch" rather than an objective reason to believe that someone was inside the home in need of assistance.  The cases finding an exigency involve a far more tangible reason to believe an injured person was inside

the house.  *Cf. Fisher*, 558 U.S. at 45-46, 49 (holding that officers had objectively reasonable basis for believing medical assistance was needed to enter house where police saw a truck with its front end smashed, broken house windows, blood on the truck, and could see the suspect screaming and throwing things with a cut on his hand, even though the suspect told the officers to go get a search warrant); *Brigham City*, 547 U.S. at 406 (holding that exigency justified warrantless entry where officers could hear violent fight inside home and saw someone inside throwing a punch to an adult's face).

An additional fact undermining the Government's exigency argument is that Officer Knight did not immediately enter the home to render assistance.  Instead, when he first arrived to the home after dispatch notified him of the victim around 11:00 a.m., he followed the ambulance with the victim inside until he was taken by helicopter.  At 12:09 p.m., Officer Knight returned to the home, secured the home, and waited for more than one hour for backup to arrive to ensure his safety before entering.  Thus, at least two hours had passed from the time of the incident causing the injury to the officers' entry into the home.  There may be circumstances where an officer waiting for backup would not preclude finding an exigency.  The Court also recognizes the vast expanse of the Navajo Nation and the limited law enforcement personnel that exist to cover the area increase the amount of time necessary to wait for backup to arrive.  Nevertheless, here, based on the totality of circumstances, the passage of time undermines the Government's argument that a true emergency existed to justify the warrantless intrusion.  The emergency aid doctrine allows officers to enter without a warrant based on the need for immediate action on the part of police.  The immediacy is what permits the officers to bypass the warrant requirement.  Where, as here, the officers have probable cause to believe a crime occurred, and that evidence might be located in the house, the hour plus wait time provided time to prepare, or at least begin

the process of seeking a warrant to search the house.

Given the scant evidence indicating that another injured person was in the house and the significant passage of time before entering in which law enforcement could have sought a warrant, the Court concludes that the Government has not met its burden to prove an exigency existed sufficient to support a warrantless entry in this case. Officer Knight's and Officer Bitsoi's entry into Defendant's home and subsequent arrest of Defendant therefore violated Defendant's Fourth Amendment rights. *Cf. United States v. Wolfe*, 452 F. App'x 180, 181-84 (3d Cir. Nov. 18, 2011) (unpublished decision) (holding that sergeant violated defendant's Fourth Amendment rights by searching second floor of home without a warrant, even though he had observed gunshot victim on first floor, blood throughout rooms on first floor, and trail of blood leading to top of stairs to second floor, because there was no exigency at time sergeant arrived when victim had been transported to hospital, victim had been shot outside the residence, and there was evidence of only one victim); *United States v. Martinez*, 643 F.3d 1292, 1296-98 (10th Cir. 2011) (affirming district court's conclusion that exigent circumstances did not justify warrantless entry into home, despite static-only 911 call from home, disheveled appearance of house, unlocked door on backside second floor of house, and electronics boxes just inside unlocked door, because there was no evidence indicating anyone was in the house, much less anyone in need of immediate assistance).[2]

Additionally, after the tribal officers escorted Defendant from the home, they handcuffed

---

[2] The Court recognizes the difficult position law enforcement officers face in borderline cases -- whether to err on the side of victim safety or a resident's Fourth Amendment rights -- when they believe a victim may be in need of assistance, but are not sure whether their belief amounts to a "hunch" or objectively reasonable belief. Nevertheless, to justify a warrantless entry, the Tenth Circuit requires more tangible evidence of a victim in need of immediate assistance within the home than that presented here. *Cf. Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010) (holding that officers violated plaintiff's Fourth Amendment rights when conducting warrantless search, despite 911 caller reporting that child in home had been hit, because there were no reasonable grounds to believe child was in home in immediate danger where adult occupants had been handcuffed away from home, occupants told officer no child was in home, and caller suggested police might have wrong address because caller was sure there was an infant and female adult).

him and placed him under arrest.  Their stated reason for his arrest was Public Intoxication in

violation of Title 17, Section 488 of the Navajo Criminal Code.  *See* Arrest Form, ECF No. 27-2.

Under Section 488, public intoxication requires that the person "appears in a public place under

the influence of alcohol."  Navajo Criminal Code, Title 17, § 488.  The only reason Defendant

was in a public place is because the tribal officers forcibly removed Defendant from the home.

On the stand, Officer Knight offered his belief that the inside of a home is a "public place" under

the Navajo Code, but this Court disagrees and finds that, under the circumstances here and at the

time of Defendant's arrest, the tribal officers did not have probable cause to arrest Defendant for

public intoxication.  Nor was Officer Knight's mistaken belief of the law reasonable in light of

the clear language of the statute.

        Nor has the Government presented argument of any other tribal law for which the officers

would have had probable cause to arrest Defendant at the time they handcuffed him and placed

him under arrest.  The Government asserts that Defendant was charged later in the evening of

June 6, 2014, with aggravated battery against a family member in violation of Section 545 of the

Navajo Tribal Code, but the Government has not argued that the officers had probable cause to

arrest him under that statute at the time they removed him from the home and handcuffed him.

Instead, those charges were added after the agents had interviewed Derrick Smith and Darryl

Atkins later that evening.

        For all the foregoing reasons, both the tribal officers' entry into the home and the arrest

of Defendant violated the Fourth Amendment.  The next question is what, if any, evidence

should be suppressed as fruit of the poisonous tree.

### 2.      Fruit of the Poisonous Tree

The exclusionary rule prohibits introduction of evidence directly obtained by a violation of the Fourth Amendment and further prohibits introduction of derivative evidence that is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.").  The "core rationale" of the exclusionary rule is that this "admittedly drastic and socially costly course" is needed to deter constitutional violations by law enforcement officers.  *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).  The exclusionary rule furthers Fourth Amendment rights both by deterring lawless conduct by federal officers and by "'closing the doors of the federal courts to any use of evidence unconstitutionally obtained.'"  *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (quoting *Wong Sun*, 371 U.S. at 486).

The Tenth Circuit places the burden on the defendant to demonstrate that the evidence would not have been discovered "*but for* the government's unconstitutional conduct."  *United States v. Sanchez*, 608 F.3d 685, 691 (10th Cir. 2010) (emphasis in original).  Once the defendant meets this burden, the Government may avoid suppression by proving that the contested evidence would have been inevitably discovered, was discovered by independent means, or was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.  *Id.*.

The "independent source" doctrine balances the "'interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime'"

by "'putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.'"  *Murray*, 487 U.S. at 537 (quoting *Nix*, 467 U.S. at 443); *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *United States v. Forbes*, 528 F.3d 1273, 1278-79 (10th Cir. 2008).  Exclusion of evidence that has a "wholly independent" source is not warranted because that "would put the police in a worse position than they would have been in absent any error or violation."  *Nix*, 467 U.S. at 443.  Similarly, "the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct."  *United States v. Larsen*, 127 F.3d 984, 986 (10th Cir. 1997).

### a.     Evidence on porch, on threshold, and observable through open interior door from porch

In this case, much of the physical evidence was on the porch, which was not enclosed in a way in which it could be considered the curtilage of the home.  Consequently, the evidence on the porch and any evidence observable in plain view from the porch and through the open interior wooden door is separately admissible under the plain view exception and did not stem from the unlawful entry and arrest of Defendant.  *See United States v. Smith*, 797 F.2d 836, 839-40 (10th Cir. 1986) ("Objects within the plain view of an officer, who has a right to be in a position to have such a view, are subject to seizure.").

### b.     Evidence collected on Defendant's person

As for the evidence discovered on Defendant's person – his clothes and his bodily fluids from the swabs – Agent Guffey collected them after he received Defendant's verbal and written consent to search.  A consensual search preceded by a Fourth Amendment violation may still be lawful if the government proves, based on the totality of the circumstances, both (1) that the consent was voluntary in fact, and (2) that there was a break in the causal connection between the

illegality and the consent to demonstrate that the consent was sufficiently an act of free will to purge the primary taint.  *See Wong Sun*, 371 U.S. at 486; *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001) (quoting *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994)); *Melendez-Garcia*, 28 F.3d at 1053-54; *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir. 1989).  The government bears a "heavy burden" in proving the break in the causal chain.  *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010).

In determining whether a consent to search preceded by a Fourth Amendment violation is sufficiently an act of free will to purge the primary taint of the illegal arrest, a court must consider the totality of circumstances surrounding the consent, including the following factors: (1) the temporal proximity between the police illegality and the consent; (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Melendez-Garcia*, 28 F.3d at 1054 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Examples of intervening circumstances include carefully explaining a consent form and advising an individual of his right to withhold consent, release from custody, an appearance before a magistrate judge, or consultation with counsel.  *Fox*, 600 F.3d at 1261.  "[T]he 'purpose and flagrancy' prong of the *Brown* test can only be aimed at exploring whether the police have exploited their illegal search." *Melendez-Garcia*, 28 F.3d at 1054 (citing *Brown*, 422 U.S. at 604).

With respect to the temporal proximity factor, the June 6, 2014 interview during which Defendant consented to the search of his person and seizure of his clothes and bodily fluids took place approximately two to three hours after his removal from the house and unlawful arrest. This two-to-three hour window is greater than the few minutes to 45-minute time periods found by the Tenth Circuit to weigh against a finding of attenuation, but under the circumstances, is not

21

so great as to clearly indicate erosion of the taint. *Compare Fox*, 600 F.3d at 1260 (listing cases of a few minutes, 30-45 minutes, and 30 minutes in which Tenth Circuit found first factor weighed in favor of finding taint was not purged), *with Brown*, 422 U.S. at 604-05 (holding that statement given less than two hours after illegal arrest was fruit of poisonous tree). The first factor thus weighs in favor of suppression.

Turning to the second factor, the intervening circumstances present here are Agent Guffey's arrival, his giving Defendant *Miranda* warnings, and his informing Defendant that he could withhold consent. The *Miranda* warnings and discussion of the consent to search form, however, are insufficient to purge the primary taint where Defendant was detained in handcuffs in the back of the police vehicle from the time of his arrest, throughout the interview, and when Agent Guffey requested his consent to search. *Cf. Taylor*, 457 U.S. at 691-94 (concluding that petitioner's custodial confession obtained six hours after his illegal arrest was fruit of that arrest and should be suppressed, despite fact that petitioner was given *Miranda* warnings three times and he visited with his girlfriend and a friend before he confessed); *Maez*, 872 F.2d at 1456-57 (holding that defendant's consent to search truck that occurred 45 minutes after his unlawful arrest was not sufficiently an act of free will to purge primary taint where he had continuously been in presence and custody of multiple officers, other than the giving of *Miranda* warnings there had been no other intervening circumstances, and the manner of the illegal arrest was such that would cause surprise, fright and confusion, and defendant vomited during the interview). Although Agent Guffey attempted to explain the consent form and noted that Defendant could refuse consent, Agent Guffey had also just informed Defendant that they were going to take the swabs, take him to jail, and then get his clothing and shoes. Given that Defendant was arrested unlawfully and the seizure was ongoing, this explanation of the consent to search form was not

sufficiently clear and careful as to purge the taint of the unlawful arrest.  The second factor thus also weighs in favor of finding the consent tainted.

As for the third factor, "purposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up. *Fox*, 600 F.3d at 1261 (internal quotations omitted).  The flagrancy of the tribal officers' violation of Defendant's Fourth Amendment rights continued to taint the statements given by Defendant while in tribal custody.  The unlawfulness of Defendant's arrest should have been obvious to a reasonable, trained officer, as Defendant was purportedly arrested for public intoxication after he was forcibly removed from his house by tribal officers, following their illegal entry into the home.  Although the tribal officers were responsible for the illegal entry and arrest, not Agent Guffey, Agent Guffey's interview of Defendant and his subsequent consent occurred while Defendant was still handcuffed in the back of the tribal officer's police vehicle and while he was under continuous custody by tribal officials for an offense for which there was no probable cause to arrest.  Consequently, the consent to search came as a result of the exploitation of the unlawful arrest.  The Court does not find that the officers' entry into the home was solely investigatory in design, rather than based on a sincere concern (albeit a mere hunch) for a potential second injured person.  Nevertheless, Defendant's unlawful arrest became investigatory in design when Agent Guffey interviewed him about the circumstances of his brother's death.  The third factor thus weighs towards finding that the taint was not purged.

The Court will therefore suppress the clothes and bodily fluids taken from Defendant on June 6, 2014, after he gave consent to search, because they constitute the fruit of the violation of

his Fourth Amendment rights.  *Cf. Kaupp v. Texas*, 538 U.S. 626, 628-29, 633 (2003) (holding

that State did not carry burden of showing break in causal chain of unlawful arrest where

defendant was arrested in home, placed in patrol car, driven to scene of crime where they

stopped for 5-10 minutes, driven then to sheriff's office, and confessed following *Miranda*

warnings, because in interim he remained in partially clothed state in physical custody of a

number of officers and no meaningful intervening event occurred).[3]

### c.       Evidence found within the home

"The Fourth Amendment recognizes a valid warrantless entry and search of premises

when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to

share, authority over the area in common with a co-occupant who later objects to the use of

evidence so obtained."  *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).  The federal agents

collected the evidence inside the home after receiving verbal and written consent from

Defendant's mother, Margaret Thomas, to search the home.  Because Ms. Thomas was the

homeowner, she could give independent permission to enter the home.  The Court finds that Ms.

Thomas's consent to search was freely and voluntarily given, as she was informed of her rights

to refuse consent in the Navajo language, she verbally gave her consent, and she confirmed that

consent by signing the written form authorizing the search.  Agent Guffey informed Defendant,

who shared the home with his mother, that they intended to search the house, and Defendant

never objected to the search.  *See* Interview Tr. 17, June 6, 2014, ECF No. 37-1.

Unlike the consent to search given by Defendant, Ms. Thomas's consent was sufficiently

attenuated from the illegal arrest to be an act of free will for a number of reasons.  First, Agent

Guffey spoke with Ms. Thomas a couple of hours after the illegal entry, outside her home, at the

---

[3] This Court need not address the voluntariness of Defendant's June 6, 2014 consent to search, because it has
determined that there was not a sufficient break in the causal chain to purge the consent from the primary taint of the
Fourth Amendment violation.

end of the driveway.  Ms. Thomas was not present at the home when the tribal officers entered

her home and arrested her son.  By the time Ms. Thomas arrived on the scene, the federal agents

had taken over the investigation, no officers were inside the home, and they were taking steps to

ensure that their entry into the home to collect evidence was done lawfully.  Her other son, Mr.

Tsosie, was the victim of the crime for which the federal agents sought evidence.  The crime had

clearly taken place, at least in part, on the porch of the home and law enforcement saw in plain

view a bloody footprint leading into the home, and thus, the agents had reason to search the

inside of the home separate and apart from the evidence the tribal officers found inside the home

while they were unlawfully within the home.  The consent Agent Guffey obtained from Ms.

Thomas was not a result of the exploitation of the unlawful entry.  Sufficient intervening factors

exist to purge the taint of the unlawful entry into Ms. Thomas's home from her subsequent

consent to search her home.  The Court finds that Ms. Thomas freely consented to the search of

her home, her consent was voluntary in fact, and her consent was sufficiently an act of free will

to purge the primary taint of the illegal entry and arrest of Defendant.  Consequently, the

evidence discovered in the home after receiving Ms. Thomas's consent to search the home is

admissible and not a fruit of the poisonous tree.  *Cf. United States v. Snype*, 441 F.3d 119, 126-

27, 135 (2d Cir. 2006) (holding that, although only 20 minutes elapsed between assumed illegal

entry of apartment and host's consent to search, consent was purged of taint because, by the time

of host's consent, SWAT team had left her apartment, defendant was arrested and removed from

premises, her own liberty had been restored, and there were intervening events that replaced

fearful atmosphere of initial forcible entry with relative calm); *United States v. Mendoza-

Salgado*, 964 F.2d 993, 1010-13 (10th Cir. 1992) (holding that wife's consent to search was

sufficiently an act of free will to purge primary tainted of assumed Fourth Amendment unlawful

entry into home where wife herself broached issue of consenting to search the home, she gave written consent after officers explained consent form, atmosphere from entry had quieted, and occupants were free to use bathroom and kitchen).

### d. Defendant's presence in home and appearance

Officer Knight had secured the home while waiting for additional back up. Consequently, if the officers had not unlawfully entered the home in the first place, they would have entered the home with Ms. Thomas's consent and may have inevitably discovered Defendant's presence in the home and the condition of his clothes and hand separate and independent of the illegal entry and arrest. *See Murray*, 487 U.S. at 539 ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered."). The parties, however, have not addressed this issue, and it is unclear whether Defendant believes the fact that he was found in the home must also be suppressed as fruit of the poisonous tree. The Court would benefit from briefing on this issue before rendering a definitive ruling, and thus, will order the parties to submit simultaneous briefs addressing whether Defendant's presence in the home and his appearance must be suppressed as the fruit of the Fourth Amendment violation.

### e. Defendant's statements

"[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (internal quotations omitted). The Government

bears the burden of proving that a confession obtained after a Fourth Amendment violation is admissible. *Id.* "The voluntariness of the statement is a threshold requirement." *Brown*, 422 U.S. at 604. The fact that a confession was voluntary for purposes of the Fifth Amendment, and *Miranda* warnings were given and understood, although important factors in the analysis, is not itself sufficient to purge the taint of an illegal arrest. *See Taylor*, 457 U.S. at 690; *Brown*, 422 U.S. at 602 ("If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted."). As in the consent to search context, in determining whether a confession has been purged of its primary taint, a court should consider the following factors: (1) the temporal proximity of the arrest and confession; (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Taylor*, 457 U.S. at 690 (quoting *Brown*, 422 U.S. at 603-04).

### 1)    June 6, 2014 Statements

For the reasons given above as to why Defendant's consent to search and seize evidence from his person was not sufficiently purged of the taint of his unlawful arrest, the June 6, 2014 statement by Defendant to the tribal officers and the June 6, 2014 interview with Agent Guffey, which took place within two to three hours of his unlawful arrest, in which he was handcuffed and in the back of the police vehicle from the time of his arrest through the interview, must also be suppressed. The Court recognizes that the tribal officers were responsible for the illegal entry and arrest, Agent Guffey was not responsible for the initial Fourth Amendment violation, and he gave Defendant his *Miranda* warnings upon arrival. Nevertheless, his *Miranda* warnings alone were not sufficient to purge the primary taint where there were no other intervening circumstances to break the causal chain. The Court will therefore suppress the June 6, 2014

statements made by Defendant to Agent Guffey based on the violation of his Fourth Amendment rights. *See Kaupp*, 538 U.S. at 628-29, 633; *Taylor*, 457 U.S. at 691-94; *Maez*, 872 F.2d at 1456-57. In light of this conclusion, the Court need not consider the voluntariness of the June 6, 2014 statements.

### 2)      June 8, 2014 Interview

Two days following his unlawful arrest, and while he continued to be detained in tribal custody, Defendant again waived his *Miranda* rights and made a confession to Agent Guffey and Investigator James.

### a)      Voluntariness

The test of voluntariness is based on the totality of the circumstances, considering both the characteristics of the defendant and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1976); *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). The court must determine whether the defendant's confession is the product of an essentially free and unconstrained choice or if his will was overborne by physical or psychological coercion, threats, or by improper inducement. *See Lopez*, 437 F.3d at 1063; *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998). A confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise free will. *Erving L.*, 147 F.3d at 1249. The Court looks to coercive police activity, express or implied. *Schneckloth*, 412 U.S. at 227.

No single factor is determinative in the voluntariness inquiry. *Lopez*, 437 F.3d at 1063. Relevant factors include (1) the suspect's age, education, and intelligence; (2) whether the suspect has been arrested and given *Miranda* warnings on earlier occasions, indicating previous experience with the criminal justice system; (3) the length of the detention and questioning; (4)

the nature of the detention and questioning, such as whether threats or promises of leniency were made; (5) any advice of a suspect's constitutional rights; (6) the use of physical punishment; and (7) whether the suspect confessed to the crime or consistently denied any involvement in the crime throughout the interview. *See Schneckloth*, 412 U.S. at 226; *Lopez*, 437 F.3d at 1063-65; *United States v. Chalan*, 812 F.2d 1302, 1307-08 (10th Cir. 1987). A suspect's personal characteristics are only relevant if the court first concludes that the officer's conduct was coercive. *Lopez*, 437 F.3d at 1064.

Defendant was questioned for approximately 37 minutes. This duration is not unduly long. *Cf. Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive."). Moreover, there is no evidence that the agents used physical punishment against Defendant before, during, or after any of the interrogations. There were only two law enforcement officers present, both of whom were friendly, using a soft tone of voice. There were no threats made, no raised voices, and no promises of leniency. Additionally, Defendant was given *Miranda* warnings again before this interview. Moreover, Defendant had previously denied involvement in the crime during the June 6, 2014 interview, demonstrating that he is not unusually susceptible to confessing under the standard pressures of being questioned by law enforcement.

Defendant initially confessed to fighting and hitting his brother multiple times, causing his mouth and nose to bleed, after Agent Guffey asked open-ended questions regarding what happened that day. It was only after confessing verbally that Agent Guffey used the guise of writing his mother a letter to prove he was not a monster as a method of getting Defendant to write his confession. The Court does not find that Agent Guffey's questioning was unduly coercive. The Court thus finds that Defendant's June 8, 2014 confession was voluntary.

**b)** **Break in Causal Connection**

Defendant relies on *Brown* and its progeny to argue that the June 8, 2014 confession is the fruit of the Fourth Amendment because there was no intervening circumstance to break the causal chain.  The Government did not address this issue.  The Court, in its research, found the case of *New York v. Harris*, 495 U.S. 14 (1990), which appears relevant to this issue, but neither party addressed this case in their briefs.

In *New York v. Harris*, 495 U.S. 14 (1990), the Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation *Payton*."  *Harris*, 495 U.S. at 21.  The Supreme Court reasoned as follows:

> Nothing in the reasoning of [*Payton*] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest.  Nor is there any claim that the warrantless arrest required the police to release Harris or that Harris could not be immediately rearrested if momentarily released.  Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk.  For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated Harris at the station house.  Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.

*Id.* at 18 (internal citation omitted).

The Supreme Court also distinguished the *Brown* and *Taylor* cases and explained why those cases would not apply to a situation like that presented here:

> In [*Brown* and *Taylor*], evidence obtained from a criminal defendant following arrest was suppressed because the police lacked probable cause. [*Brown* and

> *Taylor*] stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity. . . . [I]n cases such as [*Brown*] and its progeny, an affirmative answer to that preliminary question may be assumed, since the "illegality" is the absence of probable cause and the wrong consists of the [police] having control of the defendant's person at the time he made the challenged statement. In these cases, the "challenged evidence"—*i.e.*, the post arrest confession—is unquestionably the product of [the] illegal governmental activity—*i.e.*, the wrongful detention.

*Id.* at 18-19 (internal citations and quotations omitted). Because Harris's statement "was not the fruit of the fact that the arrest was made in the house," the Supreme Court held that the exclusionary rule did not apply to Harris's subsequent statement at the station house, although it would apply to "any evidence found, or statements taken, inside the home." *Id.* at 20.

Courts have extended the reasoning of *Harris* to evidence gained after an illegal search, not merely an illegal arrest. *See, e.g., United States v. Shetler*, 665 F.3d 1150, 1157-58 (9th Cir. 2011) (extending *Harris* analysis to confession following illegal search, but adding two additional considerations); *United States v. Villa-Velazquez*, 282 F.3d 553, 556 (8th Cir. 2002) (holding that evidence obtained during time defendant was in lawful, post-arrest custody was not tainted by earlier unlawful entry into and search of residence because officers had reasonable cause to arrest him at time of illegal entry). Where a confession occurs after an illegal search, the Ninth Circuit has added two factors that the court should consider: (1) whether the interrogating officers confronted the suspect, either physically or verbally, with the evidence that had been illegally obtained; and (2) whether the suspect was induced to confess by his knowledge that the officers had already obtained the unlawfully seized evidence, thus demonstrating the futility of remaining silent. *See Shetler*, 665 F.3d 1150, 1157-58 (9th Cir. 2011). The Court has not found a Tenth Circuit case that addresses whether these additional two

factors must be considered by the Court.

In this case, in the two days between Defendant's unlawful arrest in his home and his confession on June 8, 2014, Agent Guffey interviewed Darryl Atkins, who informed law enforcement that he had seen Defendant covered in blood and that Defendant had confessed to him that he had killed his brother.  In light of this additional evidence, coupled with the lawfully discovered evidence found at the crime scene, the Court finds that law enforcement had probable cause to arrest Defendant for the murder of Mr. Tsosie at the time Agent Guffey interviewed him at the jail on June 8, 2014.  The probable cause that the FBI developed to arrest Defendant gave them a lawful basis to hold Defendant, and they need not have momentarily released him, only to detain him once more.  *See Villa-Velazquez*, 282 F.3d at 556 ("As the *Harris* Court held, an initial illegal arrest does not require that the officers release and then re-arrest the defendant in order to continue with legal-custody proceedings.").

Before ruling on the admissibility of the June 8, 2014 confession, the Court would like the parties to brief whether *Brown* and its progeny or *Harris* and its progeny is the better governing law in this context.  The Court would also like the parties' positions on whether courts in this circuit, when applying *Harris* in the context of a confession following an unlawful search and arrest, should consider the additional factors set forth by the Ninth Circuit in *Shetler*. Finally, the Court would like the parties' positions on how the tests in *Brown*, *Harris*, and/or *Shetler* apply to the facts of this case.

### B.      Fifth Amendment

Because the Court has concluded that the June 6, 2014 statements to law enforcement must be suppressed under the Fourth Amendment, this Court need not consider whether the statements should be suppressed under the Fifth Amendment.  As for the June 8, 2014

confession, for the reasons given above, the Court finds that it was voluntary and should not be suppressed under the Fifth Amendment.

### C.        Federal Rule of Criminal Procedure 5(a)(1)(A)

Defendant also argues that the June 8, 2014 statements must be suppressed under Federal Rule of Criminal Procedure 5(a)(1)(A), which provides that a person making an arrest "must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . ." Fed. R. Crim. P. 5(a)(1)(A). "This 'presentment' requirement tended to prevent secret detention and served to inform a suspect of the charges against him." *Corley v. United States*, 556 U.S. 303, 306 (2009). The Supreme Court adopted the *McNabb-Mallory*[4] rule that generally rendered inadmissible confessions, even voluntary ones, made during periods of detention that violated Rule 5(a)'s presentment requirement. *See id.* at 308-09.

In *Corley*, the Supreme Court explained the subsequent history of the presentment rule:

> There the law remained until 1968, when Congress enacted 18 U.S.C. § 3501 in response to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and to the application of *McNabb–Mallory* in some federal courts. Subsections (a) and (b) of § 3501 were meant to eliminate *Miranda*. *See Dickerson v. United States*, 530 U.S. 428, 435–437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *infra*, at 1568 – 1569. Subsection (a) provides that "[i]n any criminal prosecution brought by the United States ..., a confession ... shall be admissible in evidence if it is voluntarily given," while subsection (b) lists several considerations for courts to address in assessing voluntariness. Subsection (c), which focused on *McNabb–Mallory*, see *infra*, at 1568 – 1569, provides that in any federal prosecution, "a confession made ... by ... a defendant therein, while such person was under arrest ..., shall not be inadmissible solely because of delay in bringing such person before a magistrate judge ... if such confession is found by the trial judge to have been made voluntarily ... and if such confession was made ... within six hours [of arrest]"; the 6-hour time limit is extended when further delay is "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]."

*Id.* at 309-10 (internal footnotes omitted). The Supreme Court in *Corley* held that § 3501

---

[4] This rule derived from the cases of *McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957).

modified the *McNabb-Mallory* rule without supplanting it. *Id.* at 322. Accordingly, when faced with a suppression motion, the district court must first find whether the defendant confessed within six hours of arrest, unless a longer delay was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate judge or other officer. *Id.* If the confession came within the six-hour safe-harbor window, it is admissible, subject to the other Rules of Evidence, so long as it was made voluntarily and the weight to be given the confession is left to the jury. *See id.* "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed." *Id.*

The time period for the presentment rule, however, does not begin until a person is arrested for a federal offense. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994); *United States v. Smith*, 606 F.3d 1270, 1278 (10th Cir. 2010). "Where a person is under arrest on solely non-federal charges, neither the prompt-presentment rule nor the safe-harbor period are relevant even when the arresting officers believe the person also may have violated federal law or the person makes an inculpatory statement to federal agents." *Smith*, 606 F.3d at 1278. *See also Alvarez-Sanchez*, 511 U.S. at 358 (noting that § 3501(c) does not apply where suspect is arrested on state charges, even if the state police have reason to believe that the suspect may also have violated federal law). Where, however, there is evidence of an "improper collaboration" or a "working arrangement" between the federal and tribal officers to deprive a suspect of federal procedural rights under Rule 5(a), the presentment rule may be triggered by an arrest on tribal charges. *See Alvarez-Sanchez*, 511 U.S. at 359; *United States v. Percy*, 250 F.3d 720, 727 (9th Cir. 2001); *United States v. Chadwick*, 415 F.2d 167, 170 & n.4 (10th Cir. 1969) ("If, from an

objective appraisal of the surrounding circumstances, it appears that an arrested person is detained in state custody for the purpose of allowing federal officers to obtain a confession before he is taken to a commissioner for arraignment in accordance with Rule 5, the confession is ipso facto inadmissible."). The burden is on the defendant to show that tribal or state custody "was designingly utilized to circumvent Rule 5(a)." *See Chadwick*, 415 F.2d at 171 (state custody case).

Here, the June 8th confession occurred well more than six hours after Defendant's arrest on tribal charges. Defendant's confession, however, took place before he was arrested on federal charges. The Court finds that Agent Guffey did not meet with the Navajo Nation prosecutor, Ms. Martin, until June 9, 2014, the day they arrested him on federal charges. Although the officers had reason to believe during his detention that he violated federal law, the Tenth Circuit has stated that the officers' belief does not matter so long as the arrest is solely on non-federal charges. To suppress the confession based on the presentment rule, Defendant must therefore show that there was a working agreement between the FBI and tribal officers to circumvent Rule 5(a).

The Court finds that there is insufficient evidence to show an improper collaboration between federal and tribal officers to violate Rule 5(a). Although the tribal officers did not have probable cause to arrest him for the stated tribal crime of public intoxication, the Court finds the error was a result of Officer Knight's lack of understanding of tribal law, not from a malicious motive to violate Defendant's presentment rights. The tribal officials added the tribal assault charge later that evening. The fact that Defendant could also have been charged federally at that time is not enough to show a "working arrangement" between the federal and tribal officers to deprive a suspect of federal procedural rights under Rule 5(a). The Court will therefore not

suppress the June 8, 2014 confession under Rule 5(a).

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress and Request for Evidentiary Hearing (**ECF No. 20**) is **GRANTED in part and DENIED in part** as follows:

1.      The Court **GRANTS** Defendant's request to suppress the evidence found on his person on June 6, 2014 (including the blood swabs from his hand and his clothing) and his June 6, 2014 statements to law enforcement based on the violation of the Fourth Amendment.

2.      The Court **DENIES** Defendant's request to suppress the evidence found outside the home, on the threshold, and inside the home.

3.      The Court **RESERVES RULING** on whether Defendant's location in the home, his physical appearance, and his June 8, 2014 statement must be suppressed.

4.      **WITHIN 14 DAYS OF ENTRY OF THIS ORDER**, the parties must file simultaneous briefs addressing their positions, with supporting authority, on the following issues:

a.      Is the fact of Defendant's presence in the home and his appearance the fruit of the Fourth Amendment violation or is that evidence admissible based on the independent source or inevitable discovery doctrines?

b.      With respect to Defendant's June 8, 2014 confession, is *Brown* and its progeny or *Harris* and its progeny the better governing law in the context of this case?

c.       Whether courts in this circuit, if applying *Harris* in the context of a confession following an unlawful search and arrest in which probable cause to arrest later arises, should consider the additional factors set forth by the Ninth Circuit in *Shetler*?

d.      How do the respective tests in *Brown*, *Harris*, and/or *Shetler* apply to the facts of this case?

**UNITED STATES DISTRICT JUDGE**